[Cite as *In re C.C.*, 2021-Ohio-1066.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re C.C.

Court of Appeals Nos. L-20-1138
L-20-1139

Trial Court Nos. JC 18269710
JC 20280028

**DECISION AND JUDGMENT**

Decided: March 29, 2021

* * * * *

Christopher S. Clark, for appellant.

Travelle D. Riley, for appellee.

* * * * *

**DUHART, J.**

**{¶ 1}** This is a consolidated appeal by appellant, the biological father of C.C.

("father"), from the August 12, 2020 judgment of the Lucas County Court of Common

Pleas, Juvenile Division, granting permanent custody of C.C. to appellee Lucas County

Children's Services ("the agency"). For the reasons that follow, we affirm the judgment.

**{¶ 2}** Father sets forth one assignment of error:

The trial court erred in finding by clear and convincing evidence that the child could not be placed with father within a reasonable time and that it is in the best interest of the child to terminate appellant-father's parental rights and to award permanent custody of the children [sic] to Lucas County Children's Services ("LCCS").

## Background

**{¶ 3}** Father and mother were not married to each other when mother became pregnant with C.C. After C.C. was born in June 2017, C.C. lived in a home with mother and her husband, R.C., until July 16, 2018, when C.C. was removed from the home.

**{¶ 4}** On the night of July 15, 2018, mother was at a bar while her husband was at the home with C.C., C.C.'s oldest half-brother and another child, when the other child became unresponsive as a result of severe injuries. Mother and her husband were arrested, charged and convicted. Mother's was convicted of third-degree felony child endangering and incarcerated.

**{¶ 5}** On July 16, 2018, the agency filed a complaint in dependency and neglect regarding C.C. and a motion for shelter care hearing in Lucas County Court of Common Pleas, Juvenile Division, case No. JC 18269710. An emergency hearing was held that same day and the court awarded interim temporary custody of C.C. to the agency. C.C. was placed in a foster home.

2.

{¶ 6} On August 30, 2018, the adjudication/dispositional hearing was held. The court found C.C. was a dependent child and awarded the agency temporary custody of C.C. Thereafter, the agency filed a motion to extend temporary custody of C.C., which the court granted on July 16, 2019.

{¶ 7} On January 28, 2020, the agency moved for permanent custody of C.C. and requested an extension of temporary custody of C.C.

{¶ 8} On April 10, 2020, A.M., mother's half-sister and C.C.'s aunt ("aunt"), filed a pro se complaint for custody of C.C. in Lucas County Court of Common Pleas, Juvenile Division, case No. JC 20280028.

{¶ 9} On June 29, 2020, mother filed a motion for legal custody of C.C. to a relative, in the original case, case No. JC 18269710.

{¶ 10} On July 13 and 17, 2020, the permanent custody hearing was held for both cases.

{¶ 11} On August 12, 2020, the juvenile court issued its judgment entry, granting permanent custody of C.C. to the agency. Father appealed. Mother, who was incarcerated throughout the juvenile court proceedings, did not appeal and she is not a party to this appeal. Further, aunt did not appeal and she is not a party to this appeal.

**The Hearing**

{¶ 12} The agency called several witnesses at the permanent custody hearing: two caseworkers and the Court Appointed Special Advocate/guardian ad litem ("CASA/GAL" or "CASA" or "GAL"). Father testified at the hearing and called two

3.

witnesses to testify on his behalf. In support of aunt's request for custody of C.C., she testified and C.C.'s maternal grandmother testified. The relevant testimony follows.

**Caseworker Anthony Cardenas**

{¶ 13} Cardenas testified he was an ongoing caseworker for the agency when the agency became involved with C.C.'s family due to injury to another child who was in mother and her husband's care. Services were identified for mother, including substance abuse treatment, parenting, housing and a mental health assessment, but the services were not put into a case plan because the perpetrator who injured the child was not known.

{¶ 14} Cardenas started working with father in perhaps December 2018, until about April or May 2019. There were concerns due to father's rape conviction and Cardenas was not comfortable sending C.C. to live with father based on the rape conviction. If father had other criminal charges, Cardenas would have been even more concerned, although "[n]ot much more is concerning than a rape conviction." Cardenas was aware father participated in treatment while in prison.

{¶ 15} Cardenas recalled father expressed a willingness to do anything asked of him. During visits with C.C., which were supervised, father was very respectful, the visits went well and there were no issues. Father would play with C.C., and C.C. was getting more comfortable with father. Father and mother had a couple of visits together with C.C.

4.

{¶ 16} Cardenas did not remember aunt, or that she was interested as a possible placement for C.C. Cardenas thought a person had to be 21 years old to be considered for placement.

### Caseworker Kari Vebenstad

{¶ 17} Vebenstad, an ongoing caseworker for the agency, testified she inherited C.C.'s case in the fall of 2019. C.C. has been in the agency's temporary custody since July 2018, and father had a case plan which consisted of completing a dual diagnostic assessment; father was compliant and there was no treatment recommendation. Father requested and was referred to parenting classes, which he attended and completed.

{¶ 18} Vebenstad was aware of father's criminal record, which included an OVI, resisting arrest and two sexually related criminal offenses involving his stepdaughter. The first sex offense occurred in Wisconsin, when he touched his stepdaughter. Father was charged, placed on probation and was to receive family counseling. In addition, father was not to have any contact with his stepdaughter until her therapist reported it was safe. However, father's family, including the stepdaughter, moved to Ohio, where the second sex offense occurred. The offense was felony rape and father was sentenced to 10 to 25 years in prison. Father spent approximately 15 years in prison. Vebenstad was concerned with father's lack of candor with his background information, "unless he's asked, he didn't tell." Vebenstad noted father was also charged with a third sexual offense.

{¶ 19} Vebenstad acknowledged father had been involved in C.C.'s case since January 2019. During C.C.'s first year of life, father's paternity was not established, and it was reported that mother's husband was the alleged father of C.C. After father became involved with C.C., father's paternity was established.

{¶ 20} Vebenstad testified father began consistent visits with C.C. in June or July 2019, when father received a one hour a week visitation time slot. Father had Level 1 supervised visitation and regularly requested more visitation time, but the scheduler did not have any available time. Vebenstad observed father's visits with C.C., which always went well. Father was very bonded with C.C. and loves him very much. There were no concerns with C.C.'s safety during supervised visits with father.

{¶ 21} On August 1, 2019, father underwent a second assessment, a sexual offender assessment with Dr. Harden, in which the doctor identified father as having zero risk of reoffending in the future. It was concerning to Vebenstad that "it was a self-disclosure, and in that initial assessment * * * [father] did not disclose * * * his previous charges in Wisconsin * * * either the one that was dismissed in the 70's or the one that he was convicted of in 1984." Vebenstad acknowledged "[l]ater it was reported that he [father] had, in fact, disclosed that and that he had been, in fact, very forthcoming * * * during that assessment, but her write-ups would fail to -- to reflect that."

{¶ 22} Vebenstad was also concerned about the nature of father's relationship with mother. They started off as friends, then mother needed a place to stay, so father offered to let mother stay with him and "[i]t was almost * * * like a trade. That she would

6.

provide him with a sexual relationship." Another concern Vebenstad had was C.C. being placed in father's legal custody, since father is still a registered sex offender and C.C. was only three years old, had some developmental delays and speech delays, and C.C. would not be able to protect himself from abuse or neglect.

{¶ 23} With respect to C.C.'s aunt, Vebenstad was not aware that the family had contacted caseworker Cardenas about aunt and her willingness to take C.C. Vebenstad first became aware of aunt in January 2020, at a permanency planning conference, when aunt's name was brought up, but the agency would not move forward with exploring her as a possible placement due to the agency's policy to only look at people 21 years old and older. After that, Vebenstad spoke with mother's lawyer and mother's mother ("grandmother") about aunt, and told them to have aunt contact her and maybe the agency would explore aunt, since aunt was fairly close to 21 years old. Vebenstad never heard from aunt.

{¶ 24} About two and one-half weeks before the hearing, Vebenstad reached out to aunt "inquiring that if she was interested * * * based on her motion that she had filed * * * that she would come down and complete some fingerprints" and background checks, "and that I would set up a time to do a home study with her." Aunt told Vebenstad that she resided with just her two young children. Aunt did not come in for fingerprinting or background checks. Nonetheless, Vebenstad scheduled a home visit and went to aunt's home on July 7, 2020, and found aunt, her boyfriend ("boyfriend"), two children and two nephews. A home study was conducted and there were no safety

7.

issues, the children were healthy and happy, the house was clean and there was food in the cabinets. Boyfriend said he did not legally reside with aunt because he is not on her Section 8 housing lease, but he stays there.

{¶ 25} Vebenstad thought aunt had the best of intentions, but there were concerns: aunt and boyfriend had reported pretty regular marijuana smoking and aunt used marijuana to self-medicate for anxiety and depression; boyfriend had a felony gun conviction; aunt's income was not stable, she started working as a clerk at 7-Eleven on June 1, 2020, but before that she had not been employed for at least a year; aunt did not believe mother would have hurt the child, despite mother being convicted and in prison; aunt had a history with Fulton County Children Services ("FCCC"), as there was a referral for domestic violence where aunt was the aggressor against boyfriend and another referral when aunt's daughter was positive for marijuana at birth.

{¶ 26} Vebenstad was aware that C.C. was placed in a foster home on July 16, 2018, then he was placed with grandmother from November 26, 2018, through February 18, 2019. C.C. returned to the original foster home because grandmother could no longer care for him. C.C. has remained in that foster home and had visitation with grandmother at least once a month. Vebenstad said C.C. had services with Help Me Grow, his speech improved and he thrived in his foster home. When C.C. was in grandmother's care, all of his skills declined.

{¶ 27} Vebenstad opined it was in C.C.'s best interest for the agency to be awarded permanent custody, with the goal of adoption. Mother was in no position to take

8.

custody of C.C. as she is in prison, due to be released in December 2020, and there were concerns including housing, income and opiate addition, such that there should be a dual assessment for mental health and substance abuse. Regarding father, there were concerns with the lack of disclosure of his charges and minimizing the situation, since he stated the charges were in the past and he did not believe they were relevant. The agency also sought maternal and paternal relatives who lived out-of-state for C.C.'s placement, but this was unsuccessful.

## CASA/GAL

{¶ 28} Lee Ann Ayers testified she was the CASA/GAL appointed to represent C.C. on March 15, 2019, after the previous CASA withdrew. Ayers continued the independent investigation of C.C. and had monthly visits, observing him at daycare and three times with father. Ayers thought father's visits with C.C. went well, except father brought sugary snacks to two of the earlier visits. Ayers collected reports, records and home studies, and spoke with caseworkers, mother and father. Ayers also spoke with aunt one time on the phone. Ayers monitored C.C.'s medical needs including his asthma. Ayers knew father was employed full-time.

{¶ 29} Ayers authored a report and recommendation, filed on June 29, 2020, in which she recommended it was in C.C.'s best interest that permanent custody be awarded to the agency. Ayers testified mother is not able to care for C.C. due to her situation, and Ayers was not comfortable with father taking custody of C.C. because of his criminal history, his lack of parenting experience and C.C. not having another adult available.

9.

{¶ 30} Regarding aunt, Ayers had only learned about her in April 2020, when aunt filed for custody of C.C. Ayers was told aunt had never contacted the agency. Ayers' concerns with aunt included the stress and commitment of adding another child to the family and the possibility of allowing C.C. to return to mother in the future. Ayers shared that mother had other children who were placed with relatives in the past, and one of the relatives, grandmother, allowed mother to have unsupervised access to the oldest child, which was not allowed. The oldest child was present when the child endangering incident happened.

{¶ 31} Ayers testified C.C. is a delightful, gentle child, who had issues with speech, but he was evaluated in January 2020, and no services were recommended.

### Dr. Tamara Harden

{¶ 32} Dr. Harden testified on father's behalf as an expert witness, without objection. She is a mental health and sexual behavior treatment and assessment provider, and she earned a master's degree in mental health counseling and a Ph.D. in counselor education and supervision. The doctor testified father contacted A Renewed Mind, the business where she was working, for a sexual behavior assessment, and she met with him twice. The meetings went very well and the doctor believed father was forthcoming.

{¶ 33} Dr. Harden prepared two assessment reports for father where she opined his risk level was low for sexually offending in the community, and no treatment was recommended. She defined low risk as "it's pretty unlikely that the person will reoffend." Two reports were prepared because she "made an error on the first report and

10.

forgot to include one of the offenses that he had reported, and so that was my error." She testified once "my attention was brought to the error, I wanted to correct it. Because I remembered clearly him reporting that." When she prepared the second report, she stated the earlier offense "did not have any effect on his risk assessment at all, but I did look at it. It was a part of my assessment process."

{¶ 34} Dr. Harden used the sexual offender treatment intervention and progress scale ("SOTIPS"), which measures 16 factors "that predict risk statistically in someone who has offended sexually." It is "a dynamic risk assessment, and those are qualities that a person can change. So those would be things like employment, financial status, sexual behavior, attitudes, taking responsibility, things like that that can vary over time." Father scored a zero, where it is "[b]etter to have lower * * * [z]ero is the lowest score."

{¶ 35} Dr. Harden felt father "took full responsibility and placed no blame anywhere else which is what we're evaluating. Criminal and rule breaking behavior and attitudes. He has no criminal history, very stable life." Father's attorney then mentioned "[w]ith the exception of the --," to which the doctor replied "[r]ight. With the exceptions of the sexual behavior. With that, I'm sorry, I should have explained that the two that are criminal, rule breaking, we do not look at the sexual behavior in that, just criminal activity. I'm sorry, I should have clarified that."

{¶ 36} The doctor also used the Static-99 test which has "ten categories and you score those. They are not able to be changed [in the future]. For instance, the age at

release from prison. If a person's ever lived with a lover for two years." Father scored a one.

{¶ 37} Father provided the doctor with certificates for treatment that he completed. She testified the certificates mean "the person actively participated in the class and showed an understanding of the concepts." To arrive at her risk level opinion, the doctor used the assessment tools, certificates, factors including "[t]imeliness, responsibility, coming to appointments, setting their appointments when they are supposed to, paying for appointments, cooperation when they're speaking to us[,] * * * [and] general attitude about being assessed."

{¶ 38} Dr. Harden explained she was "not qualified to speak to custody or anything to that of his son." She stated father's age, amount of treatment, time in the community offense-free and lack of evidence of crossover offenses are factors which have the potential to reduce his risk of offending. "A crossover offense is when someone offends against one gender and then offends later against the other gender."

{¶ 39} On cross-examination, the doctor acknowledged that father was charged with sexual offenses multiple times, his victim was a minor at least two times, and father was sent to prison for rape. Yet, Dr. Harden explained father's risk level for reoffense was low because the offenses occurred about 30 years ago, he was out of prison in 2005, and he spent time in the community without reoffending. She also stated father took responsibility for everything, and disclosed to her that he was charged with a sex offense in 1974. The doctor was asked if her opinion would change if she knew that father did

12.

not disclose that offense to the agency; the doctor responded in the negative. She said she did not know what specific question the agency asked father.

{¶ 40} Dr. Harden agreed she had to create a second report because the first report was inaccurate and key information was left out. She also agreed that someone could assume after reading the first report "that it was a one-time thing and that he [father] won't reoffend again." The first report was written when she worked at A Renewed Mind and the second report was written when she was in private practice. She was not allowed to take all of the information from A Renewed Mind to her private practice, so the information in the second report was from the first report and her memory, and she trusted her memory. At the time she met father, her caseload was probably ten people.

{¶ 41} Dr. Harden's assessment of father was based on self-disclosure and information from the agency, but she could not recall if she received criminal docket sheets. The doctor stated assessments have been found, through research studies, to be very accurate.

{¶ 42} Dr. Harden acknowledged father's aftercare took place about 20 years ago, and "[a]ftercare is appropriate after you've had treatment," but she was not aware if father had completed full treatment before aftercare. The certificates for treatment she obtained from father were for programs father attended while he was in prison for 18 years.

{¶ 43} The doctor was also asked if the age of the victim matters, and she stated it does, and she looks primarily at "whether the victim was prepubescent or postpubescent

13.

* * * because most of the time if someone offends against someone who is postpubescent they don't then have an attraction to someone who is prepubescent the research shows." Dr. Harden was aware that father's 1984 offense involved his stepdaughter who was prepubescent. The doctor was also aware father was to have no contact with the stepdaughter, but the doctor did not know if there was a no contact order when father moved to Ohio. Dr. Harden was not aware if father gave her information with respect to a counselor releasing the stepdaughter to have contact with father.

{¶ 44} Regarding the doctor's testimony that father has had no more offenses committed in the community, she was asked if it made a difference that his offenses occurred in the home to his own family member. Dr. Harden responded that is taken into consideration with the Static-99 assessment.

### Julie Bach

{¶ 45} Bach testified for father. She has known him for over ten years. She has never met C.C., but she has met mother. Bach met father at a neighborhood picnic. Bach said she needed some work done at her house and father spoke up and said he could help. He remodeled her bathroom and kitchen, and did other odd jobs. She described father as very trustworthy, honest, reliable, straight forward and a good guy. Bach also had father stay at her house and watch her dogs while she was away, and her dogs are like her kids. Bach has a son and father has been at the house when her son was there.

{¶ 46} Father told Bach about his criminal history right away, in the first few hours that they met. He told her he was going through a divorce and "about the issue

14.

with the minor" the sexual contact with the stepdaughter, and that he was a registered sex offender. He said he went to jail. Over the years, Bach learned more information, like how long father was in prison, but she "didn't ask * * * didn't care." She said it did not affect the work he was doing with her. Bach has seen father disclose his registration status with people. She has never seen him engage in criminal activity.

{¶ 47} Bach knew father had a grown daughter who lives in the Wisconsin area. Bach was aware father dated two people since she has known him, mother and someone else. Bach knew mother was married when mother was with father and staying at his house.

{¶ 48} Bach did not know that father had a conviction in another state, but she knew there was another offense. She thought his offense was against a teenager, not a ten year old.

{¶ 49} Bach has seen father around kids at picnics, and he has always been good. She recalled that father babysat C.C. at least three times while mother had problems at home or needed someone to watch the baby. Mother would bring C.C. to father's house and father would watch C.C. for the afternoon. Father would send Bach videos. This was before the blood test confirmed father's paternity and before the agency was involved. Bach said mother knew about father's "offense."

{¶ 50} Bach and father discussed if father did get custody of C.C., she would help out with school if father is not allowed on school grounds.

15.

**Father**

{¶ 51} Father testified he is originally from Wisconsin. He found out he was C.C.'s father through a DNA test on December 13, 2018.

{¶ 52} In 1976, in Wisconsin, father was charged with, he thought, statutory rape, but the charge was dismissed and there was no conviction. Father said he was charged because he "met her at a tavern. Back in the bars in Wisconsin it was 18 years old. And she had her sister's ID, and that's why I met her in a bar." One day, father was with her in "one bar where her sister worked, and that's when her sister jumped on me and asked me what I was doing. And I said, what, we're just having a couple of drinks. She said, do you know that's my sister and she's under 18? I says, no, she had an ID[,] we've been in four or five different bars for the past month or so." Father said he had seen the fake ID while he was seeing her because they were carded, and he believed she was 18 years old.

{¶ 53} In 1984, father was charged with another crime after his wife turned him in. He said he "discussed it with the detective and he felt that I should turn myself in, which I did." Father confessed and was charged with sexual assault. He did not do any jail time, but was obligated to see a counselor, three or four times, and he was on three years of probation. Father said he had no violations.

{¶ 54} In 1985, father said he sought and received permission from his probation officer to move to Toledo. Father had separated from his wife as "[w]e were recommended when I had that '84 charge that I would not live in the house until I was

16.

deemed, you know, fit to come back." At a point, father got back together with his wife, which he said was approved by the courts.

{¶ 55} In 1986, father was charged with the rape of his "step-daughter, same one." At that time, father said he was living with his wife "[o]ff and on."

{¶ 56} In October 1987, father was sentenced to 10 to 25 years in prison. He said he worked while in prison and also attended sex offender treatment classes, when available, which were recommended by the counselor. Father said the classes had a great impact on him, especially the empathy class. When asked if he thought he learned everything that he needed to learn from the classes, father stated "I felt very confident in myself."

{¶ 57} In 2005, father was released from prison, and he "was required to take another sexual evaluation during [his] parole," which was "basically a 10 to 12-week program to -- basically an assessment." Father was asked if that was a condition of his parole, and he stated "[n]o, it wasn't. The parole officer recommended it." Father testified he has not been charged with any crimes since 2005.

{¶ 58} Father said he has always worked since he was released from prison, and had his own place when he was able to afford it. When father first became involved with the agency, he was in Florida, and worked with caseworker Cardenas.

{¶ 59} In early 2019, father began visits with C.C. Father was asked if he talked to Cardenas about his criminal history and father said "[h]e was aware of my first one. I informed him of my first charge. * * * I mean this previous charge, the charge I have in

17.

Ohio." Father said Cardenas did not ask for more information about the charge or any other charges, nor did Cardenas ask father for a background check. Cardenas did recommend father undergo a sexual evaluation; father complied.

{¶ 60} In June 2019, father's job in Florida was completed, and he moved back to Ohio. Father informed the agency he wanted to start regular weekly visits with C.C. Weekly visits commenced and father only missed one visit, which was when C.C. went out of town with the foster parents. The visits were excellent until COVID. After COVID, video visits were set up and father made all of those visits. In-person visits started again, and father visited with C.C. three times. The only issue with visits, of which father was aware, was he brought sugary snacks which upset C.C.'s stomach. Caseworker Vebenstad talked to father once or twice about this issue, and father stopped bringing candy. The foster parents gave father a list of foods to bring to visits.

{¶ 61} Father brought toys to visits for C.C. and bought clothes for C.C. Father was not paying child support for C.C., but was willing to do so. Father lived in a one-bedroom apartment, but realized he probably needed a two-bedroom, so he contacted management and was put on the list for a two-bedroom apartment. Father said "if I get my son, I have full intentions within three to four, maybe six months to move to a two-bedroom apartment." The caseworker had been to father's apartment.

{¶ 62} To meet C.C.'s day-to-day needs, father has Julie Bach as one of his biggest back-ups. To get C.C. to school, Bach "would provide, if they required or whatever - - I have two vehicles. One vehicle is solely designed for him so that there is

18.

no smoking – nobody smokes in my place, but that vehicle is totally there and available for him." Father attempted to provide medical coverage for C.C., but was unable since father does not have custody. If father was awarded custody of C.C., father would have coverage.

{¶ 63} Father wants custody of C.C. and will foster relationships between C.C. and his siblings and maternal family. If father is not awarded custody, he wants aunt to be granted custody. He met aunt "only a few times briefly, maybe 10, 15 minutes." Father is not aware of the agency's concerns about aunt.

{¶ 64} Father's long-term goals include retiring when he turns 66 years old in March 2021, since he gets his full social security. He may get a full-time job while C.C. is in school so he could spend more time with C.C.

{¶ 65} Father must continue to register as a sex offender until 2025, and "[b]asically the only restriction is that I cannot live within 1000 feet of a school. That's the last I learned." Father does not have to report to neighbors, but does have to register with the sheriff once a year. Father has not been in violation of failing to report or register.

{¶ 66} On cross-examination, father was asked with how many sex offenses he was charged, and he replied "[t]wo. Well, three but it was dismissed." All of the charges involved minor victims, and two charges were against his stepdaughter in separate states. For the first charge against his stepdaughter, the counseling did not have anything to do with recidivism or reoffending, it was for the family. After he was convicted of rape in

19.

Ohio and sent to prison, he received aftercare, which he remembered "pretty well, very well." Father recalled the programs were for empathy, "[s]tress management, how to control it."

{¶ 67} Father acknowledged he had said that the conduct with his stepdaughter was consensual. He explained "[a]t that time I talked her into it and she agreed to it, but during the case, I mean, the programs and everything I learned to realize that I was the adult. It was my fault and I accept full responsibility. She was young."

{¶ 68} Father disclosed his Ohio conviction to the agency but did not disclose his Wisconsin conviction to the agency because "I figured the most recent conviction, they're well aware of my conviction. And truthfully, I don't want to lie, if they would have asked, I would have disclosed it." Father was asked if it was correct that the agency did not ask about the first conviction, and father relied "[n]o, I informed them which I turned around and found out that [C.C.] was my biological family. I felt they had the right to know." Regarding the first conviction, father said "[t]hey never asked me, sir. I was giving [sic] them aware of the charge in Ohio. If they would have asked me for any previous or anything, I reluctantly would have not held anything from them."

{¶ 69} With respect to mother, father met her through a friend, and their relationship started out as a friendship. "We were off and on. I mean, there were times that she needed a place to stay. I invited her to stay when I was out of town and she looked after my stuff. * * * She lived at times, off and on. * * * [s]he did housework." When asked about mother being married, father said "I basically didn't know. She said

20.

she was separated and he was living in Georgia." Father did not know the age difference between him and mother, but conceded he was 66 years old and thought she was about 30 or 31 years old, so the age difference was about 36 years.

{¶ 70} Father said the statutory rape charge from 1976 involved a sixteen year old, and the sexual assault victim in Wisconsin was "I think 10 or 11." The same victim was raped in 1986 when she was 13 years old.

{¶ 71} Father has a daughter who is "about 36" and lives in Wisconsin. He does not have a relationship with her because "[p]art of the empathy thing is how an adult raises a kid. I had the feeling that it was her mother that brought her up that, you know, I was bad, that she shouldn't associate with me." The mother of his daughter is his ex-wife, and the ex-wife is also the mother of the victim father raped. Father's ex-wife raised his daughter.

{¶ 72} Father agreed he told Bach about his background right away as "that's part of -- that's me. That's why I felt that any lady should be comfortable to be with me or not. I mean, it's just the way I felt." He did not tell her his whole criminal background in the beginning, he "just informed her that [he] was a registered sex offender for rape." She did not ask him with how many crimes he was charged, he volunteered it. But, he did not volunteer all of the sexual charges to the agency. Father stated he "didn't minimize. All they had to do was ask. I'm sorry. I probably should have divulged it, but at that moment I basically was informing them of this, you know, charge in the state of Ohio."

21.

{¶ 73} When father was asked how he would get C.C. to school, be involved in school and register him for school, father said "As Julie Bach stated, she is willing to help me to places that I cannot be. And there are other friends that are volunteering that said that they would, but, you know, I don't care. You know, if they want to bring outstanding lists to this court, there is quite a few people that are willing to help me." Father also stated "[a]nd I kind of figured maybe once we get together, her family."

{¶ 74} Father knew about the permanent custody hearing for about a month. Father did not know if he was allowed to drop C.C. off at school or pick him up from school, and he has not contacted the school to find out if there were restrictions. He looked into daycares and babysitters for C.C., but did not find out if there were any restrictions based on his sex offender registration.

{¶ 75} The court asked father when he got sex offender treatment and he responded while he was incarcerated. The court thought that was aftercare, and asked when father got the treatment that leads up to aftercare. Father asked what aftercare was, and the court referenced the certificates that say he had aftercare in prison. Father replied "[t]here were programs in the institution and when you complete all the programs in the institution, then you can continue with the aftercare program to make sure that -- they'll help you and guide you as, you know, upon release that nothing will reoffend."

{¶ 76} Father had a prevention plan, which was "[s]eek counseling if you feel down or whatever, talk with family, friends * * * and be able to be open-minded and be able to display and express if there is something wrong." Father informed the caseworker

22.

about the plan but did not provide her with a copy. When asked if he talked to the agency about his specific prevention plan, he said "[t]hey basically never asked me for one."

{¶ 77} With respect to the assessment by Dr. Tamara Harden, father was asked if he was aware that the doctor found his symptoms were out of proportion regarding stress, and as a result father was diagnosed with adjustment disorder with anxious mood. He said "the reason why he [sic] asked me about the stress * * * is I told him [sic] yes because I did not know exactly how it was going with me and my son. Any person would be stressed."

{¶ 78} Father did not know the name of C.C.'s doctor because the agency "has control which I, you know, I have no control over." Father asked the foster parents "every time, well, how is he doing," and father was informed about C.C.'s health. Father did not contact a pediatrician before the hearing to find out if he could personally take C.C. there.

**Grandmother**

{¶ 79} Grandmother testified her daughter, C.C.'s mother, has three children. Grandmother is raising the oldest child, who is 11 years old, grandmother's sister is raising the middle child, who is almost 6 years old, and C.C. is with foster parents. The oldest child has been in grandmother's care since he was 4 years old, and grandmother has legal custody of him, and mother had supervised visits. Grandmother is seeking legal custody of the middle child and mother signed a waiver of conflict in agreeance. No one has been able to locate the middle child's father.

23.

**{¶ 80}** Grandmother has not been able to see the middle child "[s]ince this all has occurred with mother." The oldest and middle child had a relationship before the case started but grandmother's sister will not let the middle child see the oldest child or C.C.

**{¶ 81}** Regarding mother's supervised visits with the oldest child, grandmother's understanding was that someone over 18 years old could supervise. Grandmother let mother's husband supervise the oldest child because the husband did not have a criminal background and he lived with mother. Grandmother "didn't realize that the attorney had put names of certain people" who could supervised the oldest child until mother "got into trouble and [the agency] came over to the house to investigate and talk to us."

**{¶ 82}** Grandmother is employed and does not have a criminal history. She said C.C. was removed from mother's care in 2018, when he was one, and went "with [the agency] and I'm assuming into foster care." C.C. was then placed with grandmother, in November 2018, while he was still one. C.C. was not yet talking, but grandmother did not think he had a speech issue. She read to C.C. at bedtime, which is what the foster parents said they did. Grandmother sought legal custody of C.C. and was working with caseworker Cardenas. She was told she would get help paying for daycare, clothing and food for C.C., and get cash assistance. Grandmother applied for those benefits but she did not quality because she earned too much money. Grandmother gave C.C. back to the agency in March of 2019, because she could not take care of him. She visits with C.C. once a month for about an hour. She has a good relationship with C.C.'s foster parents.

24.

{¶ 83} Grandmother talked to Cardenas about placements for C.C. including a friend, another sister and aunt; Cardenas said the agency would not look at anybody under the age of 21. Grandmother stated when C.C. was placed with her, Cardenas had aunt come down and get fingerprinted, and he said she could babysit for C.C. Aunt did babysit C.C. when grandmother went to work and aunt did a good job. When Kari Vebenstad was working as the caseworker, grandmother told Vebenstad that aunt "was interested in getting him. But she's not of age."

{¶ 84} Grandmother said mother and aunt are about nine years apart and love each other but do not "hang out or do anything." Mother has had issues with drugs and alcohol since high school, which caused problems in the family.

{¶ 85} Mother's oldest child is a straight A student and likes sports, and he goes to visits when grandmother sees C.C., so he can see his little brother. The oldest child talks to mother on the phone, but grandmother will not allow him to be alone with mother.

{¶ 86} On cross-examination, grandmother was asked if she lost visitation with C.C. because she kept asking Vebenstad about mother's husband visiting with C.C. Grandmother responded that husband has taken care of C.C. and has been the father figure in C.C.'s life. Grandmother was also asked if she told the agency the aunt was interested in C.C. before aunt's domestic violence charges. Grandmother was unsure but aunt was fingerprinted and babysat C.C. prior to the domestic violence charges.

{¶ 87} Grandmother had concerns regarding C.C.'s safety if father were awarded custody because of father's record. She was aware father is a sex offender, as she looked

25.

him up on the internet. Grandmother would not want C.C. to be unsupervised with father.

{¶ 88} Regarding grandmother's sister, who has the middle child, grandmother said her sister has held a grudge ever since grandmother informed the court, during a case between mother and grandmother's sister regarding the middle child, that "my dad [C.C.'s great-grandfather] had just got out of jail and [was] living with my sister, and he's a sex offender and just got out of jail."

**Aunt**

{¶ 89} Aunt testified she has two children, a three year old and a 10 month old; her three year old and C.C. are eight days apart. She works at the 7-Eleven on the turnpike, and has been there since June 1, 2020. Before that, aunt worked at a Sunoco and a greenhouse, but "quit those jobs to go back to the turnpike because it pays more."

{¶ 90} Aunt acknowledged she has a history with FCCC, and "[t]he first reason for involvement was a domestic violence on my son's dad [boyfriend] when I was pregnant with my daughter." "[T]he second one was for me testing positive for marijuana at the hospital with my daughter."

{¶ 91} Regarding the domestic violence charge, aunt did not have to do any classes or services with FCCC, but she was visited frequently "for the domestic violence to make sure nothing was majorly wrong at home. And they basically observed how me and [boyfriend] were together and with the kids." Boyfriend is the father of her children.

26.

{¶ 92} When aunt was charged with domestic violence, she was "very hormonal with the pregnancy and stressed out and irritated quick." As a result of the charge, she "had went to CCNO for a couple of days * * * [a]nd then we were going to court together for that case, and they had dismissed the charge there."

{¶ 93} With respect to smoking marijuana, "[FCCC] had the case open for maybe a month after I tested positive. They visited me at my home three times * * * [a]nd they had mouth swabbed me and [boyfriend] all the times. And basically we made an agreement that we don't smoke around the kids and don't smoke often, and she basically closed the case after that."

{¶ 94} Aunt smokes marijuana to help with anxiety and depression. She has been prescribed two kinds of medicines which she "didn't feel like that helped at all. It actually made me worse. And I talked to both doctors about my marijuana use for my anxiety and things, and they're willing to go further to try to get me legal * * *."

{¶ 95} Aunt said in some respects, mother has ruined aunt's life, as aunt did not really have a childhood because aunt had to help grandmother raise mother's oldest child since aunt was nine years old. Aunt does love mother. Aunt would not trust mother alone with C.C. or aunt's children, "[a] big part of it is because I do not want to end up where she is over a little mishap happening, and it could be bigger than that because of other reasons. And I'm trying to have stability for my kids and my nephew and not to have people in and out of their lives like she kind of had with [mother's oldest child]." When asked what she meant, aunt said "I don't honestly know everything about this case,

27.

and I don't really know.  I just feel like if a kid were to be injured that I'm fully responsible for[,] out of my supervision, then it would all go back on me because I have custody.  It's all my responsibility so therefore, no, I wouldn't let him go without my supervision."

{¶ 96} Aunt did not recall speaking with caseworker Cardenas, but she did get fingerprinted because "[the agency] wanted me to be a babysitter for my mother when she got custody of him [C.C.]."  When aunt was asked if she ever asked for custody of C.C., she responded "I told them [the agency] I would be willing to take [C.C.] * * * [but] [t]heir policy was you couldn't basically get the kid in your custody until you were 21."  Aunt was fingerprinted before the domestic violence charge.

{¶ 97} Concerning boyfriend, he does not live with aunt, but he often spends time at aunt's home.  Boyfriend lives with his parents, and aunt and the children spend time with him there.  Aunt's rent is set at zero, as she has subsidized housing through "Fulton County Section 8."  She has a two-bedroom, one bathroom apartment.  While aunt works, usually boyfriend watches the children.  Boyfriend is "by [aunt's] side through everything," specifically getting C.C.  Boyfriend has a felony conviction involving a gun when "he got in a conflict at the park, and then the police found a gun * * * [a]nd then they gave him probation * * * and he messed up probation for not going into a hearing with the probation officer.  And then they sent him to prison for nine months for that charge."  Boyfriend was in prison about four years ago, while aunt was pregnant with their son.  Boyfriend is 24 years old, unemployed, but looking for work.

28.

{¶ 98} Aunt did not know how to go about getting custody of C.C., although she wanted C.C. from the beginning, meaning "[t]he day I found out my sister was in prison and her kids got taken from her" or after C.C. was removed from grandmother's care. Aunt talked to grandmother, who talked to the lawyer "and that's when I was informed that I had to go down to the courts and get a motion for full custody. And that's what I did." Aunt thought the motion was filed in May or June, and she was shown the pro se complaint for custody, which was filed April 10, 2020.

{¶ 99} Aunt said caseworker Vebenstad came out to aunt's home on July 7, 2020, and asked aunt why mother was in prison and why C.C. was in the agency's care. Vebenstad asked if aunt "had CSB cases," and aunt disclosed her marijuana use. Aunt has not asked to see C.C. because of COVID, but she video-chatted with him on his birthday.

{¶ 100} On cross-examination, aunt testified she has never been to counseling for her anxiety or depression. When asked if it could have been important to speak with a counselor before self-medicating with marijuana, aunt answered "[i]n a way, but I honestly am not the type of person to come out about all of my issues. So I just kind of cope by myself with anything and I don't use marijuana for everything." Boyfriend also smokes marijuana, but she does not know exactly why he smokes, although "he does to calm down his ADHD."

{¶ 101} Aunt was asked if she had an opinion about whether or not mother could be responsible for the injuries to the child, and aunt said "I don't really have an opinion."

29.

## Juvenile Court's Decision

{¶ 102} Immediately following the hearing on July 17, 2020, the juvenile court announced that it found there was clear and convincing evidence that it was in C.C.'s best interest for permanent custody to be granted to the agency. The court supported its finding by citing to R.C. 2151.414(B)(1)(a), (D)(1)(a) and (d), and (E)(7)(d). The court said it was not comfortable placing a small child with father because of his crime. The court also stated C.C. would be "8 or 9 when you [father] get off the registry. And he's going to start school with restrictions about what you're allowed to do with him at school. He's going to start school with a stigma attached, unfortunately, because believe me parents will know that he's the son of a sex offender registrant. And from [C.C.'s] standpoint that's not in his best interest." The court observed "the professional here today felt that you posed no risk in the community, but you never did pose a risk in the community. It was in your own home."

{¶ 103} On August 12, 2020, the juvenile court issued its judgment entry, in case Nos. JC 18269710 and JC 20280028, in which it granted permanent custody of C.C. to the agency. The court made the following findings, by clear and convincing evidence, with respect to father: he has not taken the appropriate steps to prepare for the possibility of obtaining custody of C.C.; C.C. cannot be placed with father within a reasonable time and should not be placed with father; and father cannot provide an adequate, safe and permanent home for C.C.

30.

{¶ 104} The court observed, as it relates to father, that Dr. Harden made no reference in her initial sexual offender assessment report to father's prior out-of-state conviction for sexual assault, but when the doctor released a subsequent report, she indicated father had disclosed the conviction to her. The court noted "it was pointed out that Dr. Harden did not have access to her old records when she completed the update several months later * * * from memory. It was also brought up that she had approximately ten clients when she completed [father's] initial assessment. Nevertheless, the testimony from Ms. Harden was that [father] was a 'low risk' in the community."

{¶ 105} The court further noted there was "no evidence that [father] has been in any type of sex offender counseling, programs, or aftercare since 2002. Given that his prior sexual based criminal convictions were for acts committed against a child in his own home, this court still has concerns and is not convinced he offers no risk to a child inside his home."

{¶ 106} The court also observed that the GAL voiced concerns about father's criminal history and the GAL did not feel C.C. would be safe in father's home.

{¶ 107} The court further found, based on C.C.'s custodial history, C.C. has been in the agency's custody for 12 of the past 22 consecutive months, and permanent custody is in C.C.'s best interest. The court also found the agency made reasonable efforts to: avoid C.C.'s continued removal from the home; implement and finalize a permanent plan by providing case plan services and requesting permanent custody with a case plan goal of adopting; and explore multiple placements, including out-of-state relatives. The court

31.

found C.C. is thriving in his foster home, all his needs are met and delaying permanency does not serve C.C.'s best interest as the agency has identified the foster parents as a potential adoptive home.

## The Appeal

### Standard - Permanent Custody

{¶ 108} A juvenile court's decision in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167 and 03AP-1231, 2004-Ohio-3312, ¶ 28. "The underlying rationale of giving deference to the findings of the juvenile court rests with the knowledge that the juvenile judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Furthermore, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the juvenile court]." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988). Therefore, a judgment supported by some competent, credible evidence going to all essential elements of the case is not against the manifest weight of the evidence. *Id.*; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 109} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence: (1) the existence of

at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (d), and (2) the child's best interest is served by granting permanent custody to the agency. *In re M.B.*, 10th Dist. Franklin No. 04AP755, 2005-Ohio-986, ¶ 6; R.C. 2151.353(A)(4).

{¶ 110} R.C. 2151.414(B)(1)(a) provides that "the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent."  R.C. 2151.414(E) requires a juvenile court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any one of sixteen factors are met.  R.C. 2151.414(E)(1)-(16).  R.C. 2151.414 (E)(7)(d) states in relevant part, "The parent has been convicted of or pleaded guilty to * * * [a]n offense under section [R.C.] 2907.02 [rape], * * * and the victim of the offense is * * * another child who lived in the parent's household at the time of the offense."

{¶ 111} To satisfy the best interest prong of the permanent custody test, the agency must establish, by clear and convincing evidence, that permanent custody to the agency is in the best interest of the child based on an analysis under R.C. 2151.414(D). The juvenile court must consider all relevant factors, including:  the interaction and interrelationship of the child with parents, siblings, relatives and foster caregivers; the custodial history of the child; and, the child's need for permanence. *See* R.C. 2151.414(D)(1)(a), (c) and (d).

{¶ 112} Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be

established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. In order to determine whether a juvenile court based its judgment on clear and convincing evidence, the reviewing court examines the record to decide whether the trier of fact had sufficient evidence before it to satisfy the appropriate degree of proof. *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

**Father's Assignment of Error**

{¶ 113} Father argues the juvenile court's decision to deny him custody of C.C. and terminate his parental rights was based primarily on his actions in 1984 and 1986, which resulted in convictions for very serious sex crimes. Father was in prison for 18 years during which he made numerous efforts to obtain treatment which would prevent reoffending, including sex offender treatment and aftercare. Father contends he also made numerous efforts to obtain treatment upon his release from prison, which consisted of a voluntary sexual conduct evaluation program.

{¶ 114} Father submits he sought to establish paternity when he became aware that he may be C.C.'s father, and he then made every effort to involve himself in C.C.'s life by visiting with C.C. Father will provide for his son financially and emotionally.

{¶ 115} Father asserts the assessment which Dr. Harden performed provides an expert opinion that he poses a low risk "of any recurrence of his past behavior."

{¶ 116} Father maintains the agency failed to meet its burden by proving, by clear and convincing evidence, that it is in C.C.'s best interest to terminate father's parental rights and award permanent custody to the agency.

34.

{¶ 117} The agency counters that based on father's criminal history and his failure to disclose his prior sex offenses to the agency, it was properly determined it was not in C.C.'s best interest to be placed with father. Relative placements were investigated, but were not successful.

**Analysis**

{¶ 118} Upon review, the juvenile court found, pursuant to R.C. 2151.414(B)(1)(a), that C.C. could not be placed with father within a reasonable time or should not be placed with father, and also found R.C. 2151.414 (E)(7)(d) applied, as father was convicted of the rape of a child who lived in his household.

{¶ 119} Based on our review of the record, as summarized above, we conclude there is clear and convincing evidence in the record to support the juvenile court's determination that C.C. could not and should not be placed with father. In particular, the record shows father only became involved in C.C.'s life when the child was one and one-half years old, as father was not aware until then that he was C.C.'s biological father since mother was married to someone else when C.C. was conceived. Father is a registered sex offender until 2025 and he has not undergone treatment since being released from prison in 2005. Father plans to use his friend, who has never met C.C., to help with C.C. in the event father is precluded from participating due to his sex offender status. And C.C. would have a stigma attached to him due to father's sex offender status. Further, father was not forthcoming in disclosing his full history of sex crimes against minors to the agency.

35.

{¶ 120} We also conclude there is clear and convincing evidence in the record to support the juvenile court's finding that father was convicted of raping his minor stepdaughter.

{¶ 121} As to the best interest prong of the permanent custody analysis, the juvenile court considered, pursuant to R.C. 2151.414(D)(1)(a), (c) and (d), the interaction and interrelationship of C.C. with his parents, siblings, relatives and foster parents, C.C.'s custodial history and C.C.'s need for permanence. The juvenile court found, by clear and convincing evidence, that an award of permanent custody was in C.C.'s best interest.

{¶ 122} Upon this record, we conclude there is clear and convincing evidence to support the court's determination that an award of permanent custody to the agency is in C.C.'s best interest. Specifically, the record reveals C.C. has been in his foster home for the majority of his life, and was doing very well and thriving in the foster home. C.C.'s foster parents were a potential adoptive home for C.C. Given C.C.'s young age, he was not able to express his wishes, but the GAL did not feel C.C. would be safe in father's home. While C.C. and father's interaction during supervised visitations was appropriate, the court was concerned about father's risk to C.C. in father's home, since father's sexual-based criminal convictions were for acts committed in the home.

{¶ 123} Based on the foregoing, father's assignment of error is found not well-taken.

36.

**{¶ 124}** On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.              _____
JUDGE

Gene A. Zmuda, P.J.              

                                                       _____

Myron C. Duhart, J.              JUDGE
CONCUR.

                                                       _____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.